UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RAVAGO AMERICAS LLC,

      Plaintiff,

                                           CASE NO. _____

v.

JEFFREY S. SIEBENALLER,

      Defendant.

_____/

## COMPLAINT

      Plaintiff Ravago Americas LLC ("Ravago") brings this action against Defendant Jeffrey S. Siebenaller under Connecticut law, the Defend Trade Secrets Act, and Florida law. Siebenaller is a former Ravago employee who recently left Ravago to help launch a start-up division of a direct competitor; that start-up division now competes directly with Ravago's resale business. Siebenaller violated his duties to Ravago by providing confidential information and trade secret information to his new employer. Now, with his new employer, Siebenaller is continuing to misappropriate Ravago's confidential information and trade secrets, and is violating his contractual obligations to Ravago, which are governed under Connecticut law. Thus, Ravago seeks compensatory, exemplary, and punitive damages as may be allowed by law, as well as injunctive relief precluding Siebenaller from using the confidential and trade secret information he misappropriated.

### PARTIES

**Plaintiff Ravago**

1.      Ravago is a Delaware limited liability company with its headquarters at 1900 Summit Tower Boulevard, Suite 900, Orlando, Florida 32810.

2.     Ravago distributes, resells, and compounds a wide range of plastic and rubber materials purchased from its suppliers, ranging from high performance, engineered resins to recycled, post-consumer materials.

3.     Ravago's business involves high volumes and narrow profit margins, and product availability, pricing and personal relationships are very important to its overall success.

4.     Ravago is a privately held company. Ravago does not share its financial information and other business information with the public.

5.     Ravago has offices in Connecticut.

**Defendant Siebenaller**

6.     Siebenaller joined Ravago in 2009 as a senior account manager.

7.     On September 5, 2009, Siebenaller executed a Trade Secrets and Confidential Information Agreement ("Agreement") for Ravago. Connecticut law governs the Agreement. The Agreement contains an exclusive forum selection clause placing jurisdiction in the state or federal courts of Connecticut.

8.     A true and correct copy of Siebenaller's Agreement is attached hereto and incorporated herein as Exhibit A.

9.     In 2014, Siebenaller became the Business Development Manager Polypropylene at Ravago.

10.    As Business Development Manager of the Polypropylene division, Siebenaller's responsibilities included helping to maintain and develop relationships with the division's polypropylene supply partners, and overall commercial management of the polypropylene business, including product strategy, pricing, inventory management, and sales to customers.

11.    On July 13, 2018, Siebenaller "retired" from Ravago.

2

12. After "retiring" from Ravago, Siebenaller remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

13. On September 4, 2018, Siebenaller began working as an independent contractor for Vinmar Polymers America, LLC ("VPA"), a newly formed company and a direct competitor of Ravago.

14. VPA is an affiliate of Vinmar International, Ltd. ("Vinmar"), a direct competitor of Ravago.

15. VPA was formed as a Texas Limited Liability Company on or about July 10, 2018.

16. Siebenaller currently is employed as a sales consultant of VPA.

17. Siebenaller works in Florida for VPA.

18. Siebenaller lives in his home in Seminole County, Florida.

## OTHER KEY PLAYERS

19. Hermant Goradia ("H. Goradia") is Vinmar's President.

20. H. Goradia is a manager of VPA.

21. Siebenaller and H. Goradia had multiple communications with one another while Siebenaller was an officer of Ravago, during work hours, and using a mobile telephone Ravago issued to Siebenaller for business.

22. Vishal Goradia ("V. Goradia") is Vinmar's Senior Vice President. As Senior Vice President for Vinmar, V. Goradia has responsibility for Plastics, Plastics Supply Chain, and Specialty Chemicals distribution for Vinmar.

23. V. Goradia is a manager of VPA.

24.     Siebenaller and V. Goradia had multiple communications with one another while Siebenaller was an officer of Ravago, during work hours, and using a mobile telephone that Ravago issued to Siebenaller for business.

25.     Kevin Page is Vice President of Vinmar. In this capacity, Page engaged in multiple communications with Ravago employees, including Siebenaller, before August 2018.

26.     Tom Cassel is a Director at Vinmar.

27.     In his capacity as a Director for Vinmar, since September 2018, Cassel has attempted to recruit multiple Ravago employees to work for Vinmar or VPA. Upon information and belief, Cassel obtained the information to recruit these individuals from Siebenaller and from another former Ravago employee, Kirt Dmytruk.

28.     Dmytruk is now President of VPA.

29.     Siebenaller and Dmytruk had frequent communications, both while employed by Ravago and in relationship to Siebenaller and Dmytruk joining VPA.

30.     Upon information and belief, Siebenaller reports to Dmytruk now.

31.     John Ward is a former employee of Ravago. He unexpectedly resigned from Ravago on September 14, 2018. Prior to resigning from Ravago, Ward physically removed his hard drive from his company-issued computer and replaced it with an unformatted hard drive.

32.     Siebenaller and Ward communicated frequently while employed by Ravago and upon information and belief, Siebenaller and Dmytruk communicated with Ward about leaving Ravago and joining VPA.

33.     After leaving Ravago, as of September 17, 2018, Ward joined VPA as Business Director, Polypropylene & Polyethylene Durables. Upon information and belief, Ward works directly with Siebenaller and reports to Dmytruk now.

34.     Daniel Peretz is a former employee of Ravago Canada Co.

35.     Ravago Canada Co. is an affiliate of the plaintiff here.

36.     On October 9, 2018, Peretz gave notice of his resignation from Ravago. He informed

management that he was going to work for the Vinmar Group. While at Ravago, Peretz

worked with Siebenaller, Dmytruk, and Ward, his former boss.

37.     Upon his departure, Peretz took 80 confidential Ravago files. Litigation is ongoing in

Canada as a result.

38.     Peretz uploaded Ravago confidential information to an unauthorized iCloud account.

39.     Following his joining Vinmar, Peretz contacted Plaintiff's employees, soliciting them for

employment for VPA, including a recent solicitation to a West Coast salesperson based in

the United States. Upon information and belief, Peretz coordinated this solicitation for

employees with Dmytruk, Siebenaller, and Ward.

## JURISDICTION AND VENUE

40.     This Court has federal question jurisdiction over this matter, pursuant to 28 U.S.C.

§ 1331, because Ravago asserts claims against Siebenaller under the Defend Trade

Secrets Act of 2016, 18 U.S.C. § 1836(c).

41.     This Court has supplemental jurisdiction over Ravago's remaining state law claims,

pursuant to 28 U.S.C. § 1367.

42.     Siebenaller's Agreement provides for exclusive jurisdiction in the state or federal courts

in Connecticut.

43.     The Agreement states as follows:

The parties agree that this Agreement is to be governed by and construed under
Connecticut law and further agree that any claims or causes of action which arise
out of this agreement shall be instituted and litigated only in a court of competent
jurisdiction located within the State of Connecticut. Employee hereby consents to

the jurisdiction of the state and federal courts located in the State of Connecticut for the resolution of any dispute regarding or arising out of this Agreement.

(Ex. A § 5.)

44.     Ravago asserts claims against Siebenaller regarding or arising out of the Agreement.

45.     This is a court of competent jurisdiction located within the State of Connecticut.

46.     Ravago's claims include breach of contract by virtue of misappropriating confidential information and trade secrets, as well as statutory claims for misappropriation of trade secrets and tort claims for breach of fiduciary duty arising out of or related to Siebenaller's employment.

47.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2), because Siebenaller is subject to the personal jurisdiction of this Court by virtue of his Agreement. Siebenaller also agreed to venue in this jurisdiction.

## FACTS

**Siebenaller's Agreement**

48.     Siebenaller's Agreement is an enforceable contract between him and Ravago.

49.     Siebenaller is bound by the Agreement.

50.     In the Agreement, Siebenaller agreed that Ravago is "engaged in the highly competitive business of distributing plastic and rubber raw materials and compounds." (Ex. A § 1.)

51.     In the Agreement, Siebenaller agreed that Ravago's "involvement in this business has required and continues to require investment in development of certain valuable Trade Secrets and Confidential Information that are peculiar to [Ravago]'s business and the disclosure of which would cause [Ravago] great and irreparable harm." (Ex. A. § 1.)

52.     Ravago operates in a highly competitive market with narrow profit margins.

53.     Both pricing and personal relationships are very important to Ravago.

6

54.     Siebenaller is a former employee who has specialized knowledge of Ravago's internal strategy and pricing structure, as well as supplier and customer relations.

55.     The restrictions in the Agreement are reasonably tailored to protect Ravago's business from a defalcating employee.

56.     The restrictions in the Agreement are reasonable as to Siebenaller.

57.     The Agreement differentiates between "Trade Secrets" and "Confidential Information."

58.     The Agreement defines "Trade Secrets" as:

[A]ny business information, method, technique, process, formula, pattern, device, drawing, cost data or customer list that is valuable to [Ravago] and not generally known to [Ravago]'s competitors. . . . Trade Secret or Confidential Information can include, but is not limited to financial information, marketing information, personnel information, technical product information, customer information and other business information.

(Ex. A § 2.)

59.     The Agreement defines "Confidential Information" as:

(a) any data, information or documentation, other than Trade Secrets, which are valuable to [Ravago] and not generally known to the public and (b) any data, information or documentation supplied to [Ravago] on a confidential basis by its customers or vendors. . . . Confidential Information can include, but is not limited to financial information, marketing information, personnel information, technical product information, customer information and other business information.

(Ex. A § 2.)

60.     Siebenaller agreed that he would not disclose Ravago Trade Secrets and confidential information:

Employee will not, while employed by [Ravago] and for so long thereafter as the pertinent information or documentation remains a Trade Secret or Confidential Information, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secrets or Confidential Information.

(Ex. A § 2.)

61.     Siebenaller also agreed that he would return all company property:

Employee agrees to deliver to [Ravago] upon the conclusion of Employee's employment, and at any other time upon [Ravago]'s request, all computers, devices, keys, identification cards, memoranda, notes, records, computer programs, computer files, computer disks, drawings or other documentation, and all copies thereof, in Employee's possession, custody or control, that contain Trade Secrets or Confidential Information or are otherwise the property of [Ravago]. Employee agrees to return the Trade Secrets and Confidential Information regardless of whether the information was created or compiled by Employee alone or with others, or whether it was made available to Employee while employed by [Ravago].

(Ex. A § 3.)

**Pre-resignation Communications Between Siebenaller and Vinmar**

62.     Beginning in at least 2017, Siebenaller and Dmytruk began corresponding through e-mail and telephone with H. Goradia, V. Goradia, and Page to set up a meeting between Siebenaller, Dmytruk and these Vinmar representatives in Houston.

63.     A true and correct copy of an e-mail chain coordinating this meeting between Siebenaller, Dmytruk, H. Goradia, V. Goradia, and Page is attached hereto and incorporated herein as Exhibit B. There was no Ravago-related business reason for this meeting.

64.     In 2017 and prior to September 24, 2018, H. Goradia's mobile telephone number was 832-875-3501.

65.     In 2017 and prior to September 7, 2018, Siebenaller's mobile telephone number was 904-583-7757. During his employment with Ravago, Siebenaller used this mobile telephone number on behalf of Ravago, and Ravago paid the costs of this phone.

66.     Vinmar's main office telephone number is 281-618-1340.

67.     Siebenaller shared six telephone calls with Vinmar's main office at 281-618-1340 between 2017 and 2018 (while still employed with Ravago), for a total number of fifty minutes of phone conversations.

68.   There was no legitimate Ravago-related business reason for Siebenaller to have these telephone conversations with anyone at Vinmar's main office.

69.   True and correct logs of telephone calls among the telephone numbers identified in Paragraph 68 above are attached hereto as Exhibit C and incorporated herein.

70.   On September 20, 2017, Siebenaller and Dmytruk each flew to Houston, Texas, to meet with H. Goradia.

71.   On September 21, 2017, Siebenaller, Dmytruk, and H. Goradia met at Vinmar's headquarters and also at a restaurant called Via Emilia.

72.   On November 20 and 21, 2017, Siebenaller and Dmytruk exchanged e-mails discussing H. Goradia. In the e-mail exchange, Dmytruk told Siebenaller that H. Goradia wanted to meet with Siebenaller in December of that year. Siebenaller asked Dmytruk if he was still in discussions with H. Goradia, "OTR [off the record] of course."

73.   A true and correct copy of the November 20-21 e-mail exchange between Siebenaller and Dmytruk is attached hereto and incorporated herein as Exhibit D.

74.   On April 4, 2018, H. Goradia e-mailed Siebenaller to tell him that retirement was outdated. Siebenaller responded, "perhaps the spelling is re-hiremont." Siebenaller forwarded a copy of this e-mail to Dmytruk.

75.   A true and correct copy of the e-mail from Siebenaller to Dmytruk is attached hereto and incorporated herein as Exhibit E.

76.   On July 13, 2018, Siebenaller "retired" from Ravago.

77.   On September 4, 2018, Siebenaller joined VPA.

**Ravago's Business**

78.   To succeed, Ravago uses highly confidential processes and systems in all three segments of the industry: suppliers, logistics, and customers.

79.    The "supplier" segment of the business involves Ravago purchasing a broad spectrum of resin grades from manufacturers (the suppliers), which Ravago needs for product to sell to end-user customers.

80.    Ravago's supplier sector is built upon its relationship with suppliers, which Ravago devotes significant time, money and resources to develop. These critical supplier relationships result in confidential information, including but not limited to pricing, material, volume commitments, logistics, and Ravago business models tailored to the commercialization of supplier products.

81.    Ravago takes steps to protect and hold aspects of its supplier business, such as the identities of its top suppliers, the volumes purchased, business models, pricing, and logistics for transferring the resin from the supplier to Ravago and then to the end user, as confidential.

82.    Ravago's supplier confidential information is entrusted to only a select group of individuals within the company and is not generally known in the market. Supplier information is maintained in a database and Excel spreadsheets. If a competitor had access to the confidential aspects of the supplier segment, including the information in the database or the Excel spreadsheets, then the competitor could purchase the resin from the suppliers and deny the availability of resin to Ravago, which would limit its ability to sell resin to Ravago's customers.

83.    During his employment with Ravago, Siebenaller had direct access to the Ravago confidential information relating to the supplier segment of Ravago's business. Siebenaller had access to the database, as well as Excel spreadsheets containing supplier information.

84. During his employment with Ravago, Siebenaller had direct access to the Ravago trade secrets relating to the supplier segment of Ravago's business.

85. The supply chain segment involves operations and businesses deployed by Ravago to transport and store products from the point of delivery from suppliers to delivery locations for customers.

86. Ravago's supply chain sector relies upon confidential information and trade secrets, which include pricing agreements with logistics providers in the warehousing, freight, trucking, and rail industries.

87. Ravago's supply chain segment includes confidential and trade secret information that is entrusted to only a select group of individuals within the company, is protected by non-disclosure agreements, and is not generally known in the market.

88. During his employment with Ravago, Siebenaller was privy to the Ravago Confidential Information regarding Ravago's supply chain segment, information protected from disclosure by the Agreement.

89. During his employment with Ravago, Siebenaller was privy to the Ravago trade secrets regarding Ravago's supply chain segment, information protected from disclosure by the Agreement.

90. The logistics involved in the supply chain are key to Ravago's business, because it involves how Ravago contracts with trucking companies and manages delivery. If it were to lose truck capacity to a competitor, Ravago would lose business.

91. The customer segment of the Ravago business is the channel it uses to sell products to customers.

92.   Ravago's customer segment is based upon unique pricing, financing, and credit strategies, and a broad portfolio of confidential and trade secret customer lists.

93.   Ravago's customer information and strategies are entrusted to only a select group of individuals within the company and are not generally known in the market.

94.   During his employment with Ravago, Siebenaller had direct access to the Ravago confidential information relating to the supplier segment of Ravago's business.

95.   During his employment with Ravago, Siebenaller had direct access to the Ravago trade secrets relating to the supplier segment of Ravago's business.

**Ravago Confidential Information**

96.   In the Agreement, Siebenaller acknowledged that the following types of Ravago information are confidential: financial information, marketing information, personnel information, technical product information, customer information and other business information ("Ravago Confidential Information").

97.   In the Agreement, Siebenaller promised not to disclose Ravago Confidential Information.

98.   During his employment with Ravago, Siebenaller had access to Ravago Confidential Information, namely its financial information, marketing information, personnel information, technical product information, customer information and other business information.

99.   Ravago's sales strategies and pricing methodologies are within Ravago Confidential Information. Ravago's sales strategies and pricing methodologies include Ravago's competitive research and strategies for market differentiation, product implementation, deployment strategy, and price lists. This information is protected within Ravago and is not available to all employees. Siebenaller had access to Ravago's sales strategies and pricing methodologies.

12

100.    Ravago treats its customers' information as confidential information. Only a select group of employees has access to customer information. At the time of his resignation, Siebenaller had access to customer information.

**Ravago Trade Secrets**

101.    During his employment with Ravago, Siebenaller had access to Ravago's "business information, method[s], technique[s], . . . cost data, or customer list[s] . . ." ("Ravago Trade Secrets") (Ex A, § 2 "Definition of Trade Secret".) Siebenaller agreed that these items are trade secrets belonging to Ravago.

102.    Siebenaller agreed not to disclose the Ravago Trade Secrets.

*Customized Facilities and Operations*

103.    Ravago built specialized facilities that contain customized systems and operations that improve the efficiency of its warehousing, transloading, blending, debagging, and bagging operations and that give Ravago a competitive advantage ("Ravago Systems").

104.    Ravago owns the Ravago Systems, which it developed.

105.    For example, Ravago's Baytown location is a specialized facility that contains Ravago Systems.

106.    Siebenaller has visited the Baytown facility and knows the details of the Ravago Systems.

*Ravago Software*

107.    Ravago uses software to manage the various segments of its business.

108.    The software, as customized by Ravago programmers, is shared only with employees who need the software to do their work. The software is not shared outside of the business.

109.    The software's features and capabilities are valuable, proprietary, and confidential information that, if wrongfully disclosed, would enable a competitor to target Ravago's

customers more effectively by understanding their needs. Such information includes, but is not limited to, the features and specifications of the customized software Ravago has invested substantial sums in developing and maintaining and the terms of the agreements between Ravago and its customers ("Ravago Customer Software").

110. Access to the system is limited to a select group of employees, because it reveals Ravago's strategies for assessing and considering risk in order to manage credit, which is a key competitive advantage for Ravago in the market.

111. Siebenaller had access to Ravago Customer Software.

### *Ravago Customer Lists*

112. In addition to customer information maintained in its software, Ravago divisions keep customer lists on Excel spreadsheets to use in day-to-day business.

113. Siebenaller had access to those customer lists.

114. The customer lists are compilations that derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, a competitor. For example, if a competitor had Ravago's customer list, it could solicit customers easily in a market where customers are not readily identifiable by having access to purchasing history, forecasted volumes, and knowledge and contact information for procurement decision makers.

**Ravago Takes Reasonable Measures to Protect Ravago Confidential Information and Ravago Trade Secrets.**

115. Ravago employs physical protection at its work sites, including facility access controls.

116. Entry to Ravago's offices and facilities is limited to authorized-personnel only.

117. Ravago does not allow any non-employee to access its computer systems.

118. Ravago requires employees to change computer access passwords every four months.

14

119.    Employee access to information stored on Ravago's computer servers is limited by the job duties assigned to the particular employee.

120.    Ravago employees are issued a company computer, hard drive, and cellphone, each of which must be returned upon the employees' departure from the company.

121.    As a condition of employment and the use of the above stated company technology, all employees are bound by the Employee Handbook, which prohibits the disclosure, deletion, or destruction of any files or data from Ravago-issued devices.

122.    After resigning from Ravago, Siebenaller remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

123.    Ravago employees (other than information technology professionals) do not have access to the Wi-Fi network password and cannot connect devices to the Ravago network at its offices.

**Siebenaller Misappropriates Ravago Confidential Information and Ravago Trade Secrets**

124.    Upon information and belief, during the communications among H. Goradia, V. Goradia, Page, other employees of Vinmar, and Siebenaller, Siebenaller verbally relayed Ravago's Confidential Information and Trade Secrets to Vinmar or its representatives.

125.    Upon information and belief, Siebenaller used other communication means to transfer Ravago's confidential information and trade secrets to Vinmar or its representatives.

126.    Prior to his "retirement," Siebenaller asked Ravago's IT Department to transfer all of his telephone contacts from his Ravago mobile phone to his personal telephone.

127.    Upon information and belief, Siebenaller has used those contacts, and the Ravago Confidential Information and Ravago Trade Secrets to compete unfairly with Ravago on behalf of VPA.

15

**Siebenaller Uses Ravago Trade Secrets and Confidential Information to Lure Ravago's Customers.**

128. Siebenaller is now a sales consultant at VPA. Upon information and belief, Siebenaller is actively involved in the Vinmar business and the business of VPA affiliates. VPA, and its affiliated companies, are in the business of competing with Ravago.

129. Premier Polymers ("Premier") is an affiliate of VPA. VPA or Premier used Ravago Confidential Information to solicit customers it did not have previous relationships with and attempted to steal the business using knowledge of Ravago's pricing information unless Ravago cut its prices.

130. On October 12, 2018, Ravago received an email from a Ravago customer Prime Molding Technologies ("Prime"), based in Rivera Beach, Florida, indicating that Premier was offering a price below what the customer previously agreed to pay Ravago. Upon information and belief, Premier used Ravago's Confidential Information to attempt to solicit Prime's business. Ravago was forced to reduce its price in order to keep Prime as a customer. Upon information and belief, Siebenaller gave this information to Premier to compete against Ravago.

131. On November 4, 2018, Ravago received an email that Siebenaller had requested a meeting to present a proposal to CP Flexible Packaging, in York, Pennsylvania—one of Ravago's largest low density polyethylene customers.

132. Upon information and belief, Premier had no prior relationship with CP Flexible Packaging.

133. Siebenaller met with CP Flexible Packaging and presented a proposal—undercutting Ravago's confidential best offer—despite not being included in CP Flexible Packaging's most recent Request for Quotation.

134.   To keep CP Flexible Packaging's business, Ravago had to meet Siebenaller's offer, and lost profits.

**Threatened Continued Misappropriation**

135.   After "retiring" from Ravago, Siebenaller remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

136.   Ravago reasonably believes that Siebenaller—individually or through Dmytruk, Ward, and Peretz—continues to have access to Ravago Confidential Information and Ravago Trade Secrets.

137.    It is inevitable that Siebenaller will misuse that information to Ravago's harm, as upon information and belief, Siebenaller has acted as a main point of contact for VPA, soliciting existing Ravago customers and using Ravago's Confidential Information and Ravago Trade Secrets to attempt to undercut Ravago's business.

138.   Because Siebenaller continues to have access to Ravago Confidential Information, there is a real threat of continued or future misappropriation by Siebenaller of Ravago's Confidential Information.

139.   Because Siebenaller continues to have access to Ravago Trade Secrets, it is inevitable that Siebenaller will use that information to Ravago's harm.

140.   Because Siebenaller continues to have access to Ravago Trade Secrets, there is a real threat of continued or future misappropriation by Siebenaller of Ravago's Trade Secrets.

**Ravago Suffers Irreparable Harm.**

141.   Upon information and belief, Siebenaller used and continues to use Ravago's Confidential Information to assist VPA, and affiliated companies, in directly competing with Ravago.

142.   Upon information and belief, Siebenaller used and continues to use Ravago's Trade Secrets to assist VPA, and affiliated companies, in directly competing with Ravago.

143.   Ravago is the owner of the Ravago Confidential Information.

144.   Ravago is the owner of the Ravago Trade Secrets.

145.   The Ravago Confidential Information is valuable to a competitor, because it would enable the business to copy such models, methods, and strategies to compete directly with Ravago. This would give the competitor an advantage. VPA, and its affiliated companies, are competitors.

146.   The Ravago supplier information would be highly valuable to a competitor, because it would enable the business to contact suppliers with information that might not otherwise be known, leverage information unique to Ravago on volume, pricing, and commercialization strategies, and divert supply from Ravago, which would hurt the rest of Ravago's business.

147.   The Ravago customer lists would be highly valuable to a competitor, because they would enable the business to contact new customers, that might not otherwise be known, and solicit the most valuable customers first.

148.   The Ravago pricing information would be highly valuable to a competitor, because it would enable such competitor to use pricing information, that might not otherwise be known, to undercut Ravago's pricing offers to its customers and take higher margin business first.

149.   The Ravago Systems, including those housed in the Baytown facility, are a Ravago Trade Secret. The Ravago Systems derive independent economic value from not being generally known to competitors because it represents a significant investment by Ravago

of time, money, knowledge base, and resources that a competitor would need to replicate. The Ravago Systems would be highly valuable to a competitor because it would enable the business to compete by increasing efficiency, reducing profit margins, and allowing for better logistics related value-added solutions to be provided to suppliers and customers. Ravago invested considerable time and money into developing the Ravago Systems. If a competitor would be able to use the Ravago Systems without the investment of the time and money to create it independently, then the competitor would be enriched unjustly and able to compete unfairly against Ravago.

150.     The Ravago Software is a Ravago Trade Secret. The Ravago Software, or its component design and structure (even without source code), derives independent economic value from not being generally known to competitors because it represents a significant investment by Ravago of time, money, knowledge base, and resources that a competitor would need to replicate. The Ravago Software would be highly valuable to a competitor because it would: (i) enable the business to more accurately forecast sales and supply needs for customers; (ii) allow the business to push to sales person all information needed for a sale including purchasing history, current pricing on available inventory, and credit rating; and (iii) provide the business a reporting tool to track and analyze pricing lanes and availability for logistics providers. If a competitor would be able to copy the Ravago Software without the investment of time and money to design it independently, then the competitor would be enriched unjustly and able to compete unfairly against Ravago.

151.     As Siebenaller continues to use Ravago's protected information to directly solicit suppliers, as well as customers, and to lure employees, his conduct is having an immediate and detrimental effect on Ravago. In particular, Ravago has incurred

investigation and hiring costs, has had to alter its compensation structures, expend time and energy to keep employees who are being solicited, has had to reduce its prices to keep customers and not lose business to VPA and Premier, and has had to implement other protective means that will be more fully developed during discovery and as the case is ongoing.

152. Siebenaller is acting as a vessel to solicit Ravago employees to work for Vinmar or VPA, using Ravago Confidential Information involving employee performance and skill to target specific Ravago employees.

153. Ravago's September 2018 telephone records show that Siebenaller, Dmytruk, Ward, and Vinmar contacted several Ravago employees for purposes of soliciting those employees to work for Vinmar or VPA. A true and correct copy of the telephone records showing these communications between Siebenaller, Dmytruk, Ward, Vinmar and Ravago employees is attached hereto and incorporated as Exhibit F.

154. Ravago does not have access to the information solely in Siebenaller's possession or custody, or under his control regarding how Siebenaller has used Ravago Confidential Information and Ravago Trade Secrets to benefit himself, VPA, Premier, or Vinmar. Upon information and belief, Siebenaller has disclosed Ravago Confidential Information and Ravago Trade Secrets to VPA, Premier, and Vinmar, who are using that information (including confidential information about the best employees to solicit away from Ravago) to compete with Ravago. Siebenaller is being personally compensated and is benefitting directly from his misuse of the Ravago Confidential Information and the Ravago Trade Secrets.

**Prior Litigation**

155.   On September 24, 2018, Ravago sued Siebenaller for these violations, along with other defendants, in the United States District Court for the Middle District of Florida ("First Action").

156.   Siebenaller moved to dismiss the claims there for failure to join indispensable parties, contending that Vinmar, Premier, and VPA were indispensable to the litigation and outside of the district court's jurisdiction.

157.   Ravago previously moved for injunctive relief in the First Action, and at the time of filing this Complaint, the motion had not been decided due to claims by other defendants for lack of personal jurisdiction.

158.   Ravago has acted swiftly and consistently to protect its interests in this matter.

159.   To avoid concerns surrounding any jurisdictional issues in the First Action, Ravago brings this action against Siebenaller in this District.

**CAUSES OF ACTION**

**COUNT I**
**BREACH OF CONTRACT – CONFIDENTIAL INFORMATION**

160.   Ravago incorporates Paragraphs 1 – 159 above as if fully restated herein.

161.   The Agreement, as detailed in Paragraphs 48 to 61 above and incorporated herein, restricts Siebenaller from using or disclosing Ravago Confidential Information.

162.   Siebenaller breached, and continues to breach, the Agreement by using and/or disclosing Ravago Confidential Information to benefit Vinmar, VPA, or Premier.

163.   Ravago is entitled to damages in an amount to be determined at trial resulting from Siebenaller's misuse of Ravago Confidential Information to solicit customers and undercut Ravago's pricing, causing loss of profit.

164. Ravago is entitled to an award of attorneys' fees under Section 5 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

165. Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Siebenaller's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

166. In addition Ravago is entitled to injunctive relief, as Siebenaller has proximately caused Ravago irreparable harm because of the loss of its exclusive use of the Ravago Confidential Information. In the Agreement, Siebenaller agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement. Siebenaller agreed as follows:

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining Employee from engaging in activities in breach of this Agreement.

(Ex. A § 5.)

167. The balance of equities tips in Ravago's favor, because Siebenaller agreed not to and has no reason to use Ravago Confidential Information.

168. An injunction preventing Siebenaller from using Ravago Confidential Information is in the public interest.

169.   Ravago is entitled to an injunction preventing Siebenaller from using Ravago Confidential Information.

## COUNT II
## BREACH OF CONTRACT – TRADE SECRETS

170.   Ravago incorporates Paragraphs 1 – 159 above as if fully restated herein.

171.   The Agreement, as detailed in Paragraphs 48 to 61 above and incorporated herein, restricts Siebenaller from using or disclosing Ravago Trade Secrets.

172.   Siebenaller breached, and continues to breach, the Agreement by using and/or disclosing Ravago Trade Secrets.

173.   Ravago is entitled to damages in an amount to be determined at trial resulting from Siebenaller's misuse of Ravago Trade Secrets to solicit customers and undercut Ravago's pricing, causing loss of profit.

174.   Ravago is entitled to an award of attorneys' fees under Section 5 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

175.   Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Siebenaller's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

176.   In addition Ravago is entitled to injunctive relief under Section 5 of the Agreement, as Siebenaller has proximately caused Ravago irreparable harm because of the loss of its exclusive use of the Ravago Trade Secrets.

177.    The balance of equities tips in Ravago's favor, because Siebenaller agreed not to use the Ravago Trade Secrets and Siebenaller has no reason to use Ravago Trade Secrets.

178.    An injunction preventing Siebenaller from using Ravago Trade Secrets is in the public interest.

179.    Ravago is entitled to an injunction preventing Siebenaller from using Ravago Trade Secrets.

## COUNT III
## BREACH OF FIDUCIARY DUTY

180.    Ravago incorporates Paragraphs 1 – 159 above as if fully restated herein

181.    As the Business Development Manager of the Polypropylene division, Siebenaller owed a fiduciary duty to Ravago. This duty includes without limitation, duties of good faith, care, and loyalty.

182.    By virtue of the conduct and acts described herein, Siebenaller breached the fiduciary duties owed to Ravago.

183.    As a result of Siebenaller's conduct and actions as described throughout this Complaint, Ravago has been damaged in an amount to be determined at trial.

184.    Siebenaller's actions were willful and in reckless disregard of Ravago's rights and interests, entitling Ravago to punitive damages in an amount to be determined at trial.

## COUNT IV
## VIOLATION OF THE DEFEND TRADE SECRETS ACT

185.    Ravago incorporates Paragraphs 1 – 159 above as if fully restated herein.

186.    This is an action for damages and injunctive relief under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA").

187.    Ravago owns and possesses the Ravago Trade Secrets.

188. Ravago's business operates in interstate commerce and it uses the Ravago Trade Secrets in interstate commerce.

189. The Ravago Trade Secrets are not public and are made available only to select employees who require the information for performance of their duties.

190. The Ravago Trade Secrets are trade secrets under the Defend Trade Secrets Act because they are comprised of business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, as described in 18 U.S.C. § 1839(3).

191. As set forth herein, Ravago takes reasonable measures to keep the Ravago Trade Secrets secret.

192. The Ravago Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means to competitors.

193. Siebenaller acquired the Ravago Trade Secrets under a duty to maintain their secrecy.

194. Ravago did not give permission to Siebenaller to use the Ravago Trade Secrets when he left Ravago.

195. Siebenaller took the Ravago Trade Secrets for his personal benefit to achieve a new position with VPA.

196. Siebenaller willfully and maliciously misappropriated the Ravago Trade Secrets and continues to have them to this day.

197. As a result of Siebenaller's misappropriation of the Ravago Trade Secrets, Ravago has suffered damages for his prior actions, which if not enjoined, will be difficult if not impossible to measure, including loss of profits that would have been earned but for his

actions. Ravago is thus entitled to recover any monetary damages for actions taken prior to injunctive relief being granted.

198.    Siebenaller's conduct has been willful, entitling Ravago to exemplary damages under the Defend Trade Secrets Act.

199.    As a result of Siebenaller's misappropriation of the Ravago Trade Secrets, Ravago is suffering injury and harm due to its reputation and good will among its customers and suppliers. Ravago may lose customers and suppliers to competitors that it cannot recover. Without injunctive relief, Ravago will sustain irreparable injury for which there is no adequate remedy at law.

## COUNT V
## THREATENED MISAPPROPRIATION UNDER THE DTSA

200.    Ravago incorporates Paragraphs 1 – 159 above as if fully restated herein.

201.    Under the DTSA, the Court may grant an injunction, "to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable." 18 U.S.C. § 1836(b)(3)(A).

202.    In addition, the Court may require, "affirmative actions to be taken to protect the trade secret." 18 U.S.C. § 1836(b)(3)(A)(ii).

203.    Unless enjoined, Siebenaller threatens to continue to use or disclose the Ravago Trade Secrets in his capacity as a consultant of VPA.

204.    As a proximate result of Siebenaller's conduct, Ravago is likely to suffer irreparable harm in the absence of injunctive relief because of the threatened loss of its exclusive use of the Ravago Trade Secrets.

205. The balance of equities tips in Ravago's favor, because Siebenaller agreed not to use the Ravago Trade Secrets and Siebenaller has no legitimate reason to use the Ravago Trade Secrets.

206. An injunction preventing Siebenaller from using the Ravago Trade Secrets is in the public interest.

207. Ravago is entitled to an injunction preventing Siebenaller from using or threatening further disclosure of Ravago Trade Secrets.

**COUNT VI**
**VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT**

208. Ravago incorporates Paragraphs 1 – 159 above as if fully restated herein.

209. This is an action for damages and injunctive relief under the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes ("FUTSA").

210. Ravago owns and possesses the Ravago Trade Secrets.

211. Ravago's headquarters are in Florida.

212. Immediately prior to his "retirement" from Ravago, Siebenaller was a resident and citizen of Florida. Upon information and belief, Siebenaller remains a citizen of Florida to this day.

213. Ravago's business operates in interstate commerce, directed from its headquarters in Florida.

214. After resigning from Ravago, Siebenaller remains subject to a duty not to use trade secrets that he acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

215. The Ravago Trade Secrets are not public and are made available only to select employees who require the information for performance of their duties.

216.   The Ravago Trade Secrets are trade secrets under the FUTSA, because they are comprised of business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, as described in Fla. St. § 688.002(4).

217.   As set forth herein, Ravago takes reasonable efforts under the circumstances to keep the Ravago Trade Secrets secret.

218.   The Ravago Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

219.   Siebenaller acquired the Ravago Trade Secrets under a duty to maintain their secrecy.

220.   Ravago did not give permission to Siebenaller to use the Ravago Trade Secrets when he left.

221.   Siebenaller took the Ravago Trade Secrets for his personal benefit to achieve a new position with VPA and for a larger salary at VPA.

222.   Siebenaller willfully and maliciously misappropriated the Ravago Trade Secrets.

223.   As a result of Siebenaller's misappropriation of the Ravago Trade Secrets, Ravago has suffered damages for his prior actions, which, if not enjoined, will be difficult if not impossible to measure, including loss of profits that would have been earned but for his actions. Ravago is thus entitled to recover any monetary damages for actions taken prior to injunctive relief being granted.

224.   Siebenaller's conduct has been willful, entitling Ravago to exemplary damages under the FUTSA.

225.     As a result of Siebenaller's misappropriation of the Ravago Trade Secrets, Ravago is suffering injury and harm due to its reputation and good will among its customers and suppliers. Ravago may lose customers and suppliers to competitors that it cannot recover. Without injunctive relief, Ravago will sustain irreparable injury for which there is no adequate remedy at law.

**COUNT VII**
**THREATENED MISAPPROPRIATION UNDER THE FUTSA**

226.     Ravago incorporates Paragraphs 1 – 159 above as if fully restated herein.

227.     Under the FUTSA, "[a]ctual or threatened misappropriation may be enjoined. "§ 688.003(1), Fla. St."

228.     Unless enjoined, Siebenaller threatens to continue to use or disclose the Ravago Trade Secrets in his capacity as a consultant of VPA.

229.     As a proximate result of Siebenaller's conduct, Ravago is likely to suffer irreparable harm in the absence of injunctive relief because of the threatened loss of its exclusive use of the Ravago Trade Secrets.

230.     The balance of equities tips in Ravago's favor, because Siebenaller agreed not to use the Ravago Trade Secrets and Siebenaller has no reason to use Ravago Trade Secrets.

231.     An injunction preventing Siebenaller from using Ravago Trade Secrets is in the public interest.

232.     Ravago is entitled to an injunction preventing Siebenaller from using Ravago Trade Secrets.

**PRAYER FOR RELIEF**

Based on the foregoing, Ravago prays for the following relief:

1.     Specific performance by Siebenaller of all obligations under the Agreement.

2.      Judgment in favor of Ravago against Siebenaller for breach of contract for violating Sections 2 and 3 of the Agreement, jointly and severally, awarding all available relief, including compensatory damages, costs, and attorney's fees, in an amount to be determined at trial.

3.      Judgment in favor of Ravago against Siebenaller for violation of the DTSA, awarding all available relief, including compensatory and exemplary damages in an amount to be determined at trial.

4.      Judgment in favor of Ravago against Siebenaller, awarding all available relief, including compensatory and exemplary damages and attorney's fees in an amount to be determined at trial, under the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes, as may be appropriate.

5.      Injunctive relief preventing Siebenaller, his agents, employees, attorneys, and other persons who are in active concert or participation with Siebenaller, from using Ravago Confidential Information, including its product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information, so long as that information remains Confidential under the Agreement.

6.      Injunctive relief preventing Siebenaller, his agents, employees, attorneys, and other persons who are in active concert or participation with Siebenaller, from using Ravago Trade Secrets, including the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning Ravago's products and services.

7.      Injunctive relief to prevent Siebenaller's threatened misappropriation under the DTSA, including restricting Siebenaller's activities with VPA and its related entities to prevent disclosures of the information.

8.      Injunctive relief to prevent Siebenaller's threatened misappropriation under the FUTSA, including restricting Siebenaller's activities with VPA and its related entities to prevent disclosures of the information.

9.      For trial by jury for all claims so triable.

10.     For all other relief as the Court may find just and proper.

Respectfully submitted,

*/s/ James T. Shearin*
**James T. Shearin  - (ct 01326)**
jtshearin@pullcom.com
PULLMAN & COMLEY LLC
850 Main Street, P.O. Box 7006
Bridgeport, Connecticut 06601-7006
Telephone No. 203-330-2240
Facsimile No. 203-576-8888

**Oliver Benton Curtis III**
*To be admitted pro hac vice*
ben.curtis@nelsonmullins.com
NELSON MULLINS BROAD AND CASSEL
2 South Biscayne Blvd., # 2100
Miami, Florida 33131
Telephone No. 305-373-9464
Facsimile No. 305-373-9443

**Erika Birg**
*To be admitted pro hac vice*
erika.birg@nelsonmullins.com
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th St. NW, Suite 1700
Atlanta, Georgia 30363
Telephone No. 404-322-6110
Facsimile No. 404-322-6404